2011 WY 54

Ronald Lee **WORMAN** and Sherri Lynne **Worman, Deceased, Appellants** (Plaintiffs),

v.

**BP AMERICA PRODUCTION COMPANY, Appellee** (Defendant).

No. S–10–0162.

Supreme Court of Wyoming.

March 25, 2011.

Representing Appellants: Larry B. Jones and William L. Simpson, Burg, Simpson, Eldredge, Hersh & Jardine, PC, Cody, Wyoming; Aaron J. Vincent and John R. Vincent, Vincent & Rutzick, Riverton, Wyoming. Argument by Mr. Jones.

Representing Appellee: John A. Coppede, John M. Walker, and Robert J. Walker, Hickey and Evans, LLP, Cheyenne, Wyoming. Argument by Mr. Robert J. Walker.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1] An arbitrator denied Ronald Worman's claims against BP America Production Company. In the district court, Mr. Worman sought to vacate the arbitrator's decision. The district court denied the motion, and Mr. Worman appealed. We will affirm the district court.

## ISSUE

[¶ 2] Mr. Worman contends that the arbitrator's decision must be vacated because it shows "a manifest mistake of fact and law."

## FACTS

[¶ 3] On August 23, 2006, Mr. Worman was working for Nabors Drilling Company on an oil rig in Carbon County, Wyoming. The well site was owned and operated by BP, and Wayne Sanford was BP's "company man" on site.[1] According to Mr. Worman,

---

1. BP contended that Mr. Sanford was an independent contractor, not a BP employee. Mr.

Mr. Sanford, "[w]ithout warning, provocation, or any cause," grabbed Mr. Worman and placed him in a "head lock" and squeezed. Mr. Worman felt a "popping sensation in his neck, and immediately experienced significant and severe pain." A few minutes later, Mr. Sanford put his hands around Mr. Worman's neck and began choking him. Mr. Worman filed suit against Mr. Sanford, BP, and two co-workers, claiming he had sustained serious and permanent injury to his neck as a result of Mr. Sanford's actions.[2]

[¶ 4] BP filed a motion with the district court seeking to compel arbitration of the claims, asserting that arbitration was required pursuant to agreements among BP, Nabors Drilling, and the employees of Nabors. The district court stayed the litigation and ordered the parties to submit to arbitration. At some point, Mr. Worman reached settlement agreements with the other defendants, and arbitration proceeded only on his claims against BP. The arbitrator ruled that BP was liable for Sanford's actions only if they were "within the scope of employment or apparent scope of authority." She concluded that Mr. Sanford's actions constituted "horseplay" that was "motivated by personal reasons" and "outside the scope of his authority." On that basis, she ruled that BP was not liable to Mr. Worman.

[¶ 5] Mr. Worman asked the district court to vacate the arbitrator's decision, asserting that it reflected a "manifest mistake of Wyoming law." The district court concluded that manifest mistake of law is not one of the grounds available for vacating this arbitration award, but even if it were, the Arbitrator had not made a manifest mistake of Wyoming law. It denied Mr. Worman's

Worman contended, based on the degree to which BP controlled and directed his work, he should be treated as a BP employee. The arbitrator concluded that Mr. Sanford had an "apparent agency relationship" with BP, and accordingly, BP was potentially liable for Mr. Sanford's actions under the doctrine of *respondeat superior*. This conclusion is not at issue in this appeal.

2. Mr. Worman's wife, Sherri Lynne Worman, is also a named plaintiff in this litigation. In a footnote to his brief, Mr. Worman informs us that

motion, and Mr. Worman perfected this appeal.

### STANDARD OF REVIEW

[¶ 6] We review *de novo* a district court's decision to confirm, vacate, or modify an arbitration award. "When reviewing the district court's order after an arbitration, we 'undertake a full review of the record without deference to the views of the trial court.'" *Welty v. Brady*, 2005 WY 157, ¶ 12, 123 P.3d 920, 924 (Wyo.2005), quoting *JBC of Wyoming Corp. v. City of Cheyenne*, 843 P.2d 1190, 1194 (Wyo.1992), quoting *Inter–Mountain Threading, Inc. v. Baker Hughes Tubular Servs., Inc.*, 812 P.2d 555, 558 (Wyo.1991). At the same time, this Court, like the district court, shows substantial deference to the decision of the arbitrator.

In reviewing the record below, we are mindful that the grounds for vacating or modifying an arbitrator's award remain narrow in scope. Because of its voluntary, informal nature, awards made in arbitration are subject to less intensive scrutiny than are, for example, the orders of administrative agencies. The reviewing court must observe the principle that arbitrators are free to fashion forms of relief which could not be ordered by a court in law or equity. Furthermore, we are reluctant to disturb an arbitrator's just solution to a controversy, even if it differs from the resolution we might have chosen, had we been in the arbitrator's place. As a voluntary method for resolution of disputes, arbitration is embedded in the public policy of Wyoming and is favored by this court.

*JBC*, 843 P.2d at 1194 (internal citations omitted).

Sherri Worman died unexpectedly between the arbitration hearing and the Award. Although the Arbitrator was made aware of her death, no formal proceedings were undertaken to substitute her estate since the award denied any recovery. Should this Court reverse and remand to the Arbitrator for reconsideration and an award of damages, Appellants submit that at that time it would be appropriate to have the Arbitrator formally consider the effect of Mrs. Worman's death.

Because we do not reverse and remand, it will be unnecessary to substitute her estate as a plaintiff.

## DISCUSSION

[¶ 7] Pursuant to the parties' agreements, this arbitration was governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16. The United States Supreme Court has held that the grounds for vacating an arbitration award under the Federal Arbitration Act are limited.

> Congress enacted the FAA to replace judicial indisposition to arbitration with a "national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, [1207,] 163 L.Ed.2d 1038 (2006).... The Act also supplies mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it. [9 U.S.C.] §§ 9–11. An application for any of these orders will get streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court. Under the terms of § 9, a court "must" confirm an arbitration award "unless" it is vacated, modified, or corrected "as prescribed" in §§ 10 and 11. Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one.

> The Courts of Appeals have split over the exclusiveness of these statutory grounds when parties take the FAA shortcut to confirm, vacate, or modify an award, with some saying the recitations are exclusive, and others regarding them as mere threshold provisions open to expansion by agreement.... We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification.

*Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 581–84, 128 S.Ct. 1396, 1402–03, 170 L.Ed.2d 254 (2008) (internal citation and footnotes omitted). The statute provides that an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

[¶ 8] "Manifest mistake of law," sometimes termed "manifest disregard of law," has been recognized as a judicially-created or "common law" basis for vacating an arbitration award. *Welty,* ¶ 11 n. 2, 123 P.3d at 924 n. 2. However, manifest mistake of law is not explicitly listed in the federal statute quoted above, and it is unclear "whether judicially-created grounds for vacatur survive after *Hall Street Associates.*" *Hicks v. Cadle Co.,* 355 Fed.Appx. 186, 196 (10th Cir.2009) (unpublished).[3] In that case, the Tenth Circuit Court of Appeals listed the First, Fifth, Sixth, Eighth, and Eleventh Circuits as having "decided that manifest disregard of the law is no longer an independent ground for vacating arbitration awards under the FAA," while the Second and Ninth Circuits maintain that manifest disregard "remains a valid ground for vacatur." *Id.* at 196–97. But having discussed the split of authority, the Tenth Circuit found it unnecessary to reach the issue because no manifest disregard of the law was demonstrated in the case before it.

[¶ 9] We have considered the various decisions listed by the Tenth Circuit, and are more persuaded by those ruling that manifest mistake of law is not one of the grounds for vacating an arbitration award under the Federal Arbitration Act. This is based in part on the language used by the United States Supreme Court in *Hall Street*

---

**3.** We recognize that this unpublished decision is non-precedential, but find its discussion of the split of authority among the Circuit Courts of Appeal to be helpful.

*Associates,* stating that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification." We are inclined to interpret the statement literally. We are also mindful of the established principle that courts give great deference to arbitrators' decisions.

> Once an arbitration award is entered, the finality that courts should afford the arbitration process weighs heavily in favor of the award, and courts must exercise great caution when asked to set aside an award. Because a primary purpose behind arbitration agreements is to avoid the expense and delay of court proceedings, it is well settled that judicial review of an arbitration award is very narrowly limited.

*Foster v. Turley,* 808 F.2d 38, 42 (10th Cir. 1986) (internal citations omitted). In *Hall Street Associates,* the United States Supreme Court referred to

> a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway. Any other reading opens the door to the full-bore legal and evidentiary appeals that can "rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process," *Kyocera [Corp. v. Prudential–Bache Trade Services, Inc.],* 341 F.3d [987,] 998 [ (9th Cir.2003) ]; *cf. Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 184 ( [7th Cir.] 1985), and bring arbitration theory to grief in postarbitration process.

552 U.S. at 588, 128 S.Ct. at 1405, 170 L.Ed.2d 254. Restricting the available grounds for vacating an arbitration award is consistent with this policy.

[¶ 10] For these reasons, we are inclined to conclude that manifest mistake of law is no longer a valid basis for vacating an arbitration award under the Federal Arbitration Act. We would therefore tend to affirm this decision by the district court:

> Having relied on an argument that the Arbitrator made a "manifest mistake of Wyoming law," [Mr.] Worman has provided no grounds upon which [the district court] could apply § 10 or § 11 of the FAA to vacate or modify the Arbitrator's denial

of an award to him. Accordingly, on those grounds alone, [the district court] must deny *Plaintiffs' Petition to Vacate Arbitration Award.*

[¶ 11] However, there remains a distinct split of federal authority on this issue. Moreover, the United States Supreme Court recently declined to determine the issue. *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* — U.S. ——, ——, 130 S.Ct. 1758, 1768 n. 3, 176 L.Ed.2d 605 (2010) ("We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates* . . . as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10."). As noted above, the Tenth Circuit Court of Appeals has also declined to weigh in on the question. *Hicks,* 355 Fed.Appx. at 197. Given this uncertainty in the federal authority, the district court was "willing to concede that there is some room for [Mr.] Worman's argument" that manifest mistake of law remains a valid basis for vacating an arbitration award under the Federal Arbitration Act. The district court, "in the interest of caution and full explanation," proceeded to consider the merits of Mr. Worman's position. We will do the same.

[¶ 12] To show that the arbitrator's award could be vacated for a manifest mistake of law, Mr. Worman cannot rely on mere legal error. The standard is much higher than that, and has been characterized as "highly deferential." *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1463 (10th Cir.1995).

> An arbitrator's erroneous interpretations or applications of law are not reversible. *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953). Only "manifest disregard" of the law is subject to reversal. *Id.* This Court has characterized the "manifest disregard" standard as "willful [in]attentiveness to the governing law." *Jenkins v. Prudential–Bache Sec., Inc.,* 847 F.2d 631, 634 (10th Cir.1988). Manifest disregard of the law "clearly means more than error or misunderstanding with respect to the law." *Merrill*

*Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986). *Id.*

[¶ 13] The district court carefully evaluated the arbitrator's decision in light of applicable Wyoming law, and concluded that the arbitrator made no manifest mistake. As stated in our discussion of the standard of review above, we do not defer to the views of the trial court in this case. *Welty,* ¶ 12, 123 P.3d at 924. However, when we find a district court's decision completely persuasive, we are free to follow its lead.

[¶ 14] At the heart of the arbitrator's decision, the district court wrote, was the conclusion that Mr. Sanford was in legal effect an employee of BP, but was acting outside the scope and course of his employment when he injured Mr. Worman. Mr. Worman contends that the arbitrator was mistaken about Wyoming law concerning whether on-the-job "horseplay" may be within the scope of employment. He relies on *State ex rel. Wyoming Workers' Compensation Div. v. Espinoza,* 924 P.2d 979 (Wyo.1996), in which Ms. Espinoza had been awarded workers' compensation benefits for an injury she sustained when "[h]er path was blocked by a young male co-employee. Horseplay between the two suddenly escalated and the co-employee punched [her], breaking her jaw." *Id.* at 980. The Division appealed, asserting that the injury did not arise out of and in the course of Ms. Espinoza's employment, because "momentary horseplay between two teenagers severed the requisite connection between [her] work and her injury." *Id.* at 981. We disagreed, noting that immediately before she was injured, Ms. Espinoza was retrieving a customer's order. Her encounter with her co-worker "was not a frolic of her own but a condition of her employment—an obstacle in the path of her efforts to further her employer's business objectives by providing prompt customer service." *Id.*

[¶ 15] As the district court concluded, *Espinoza* is readily distinguished from Mr. Worman's case. In *Espinoza,* a workers' compensation case, the question was whether the injured worker was acting in the scope of her employment. That could provide direct precedent in deciding, in Mr. Worman's case,

whether Mr. Worman was acting in the scope of his employment when the horseplay occurred. However, the question in Mr. Worman's *respondeat superior* case was whether Mr. Sanford, the person who caused the injury, was acting in the scope of his employment. In the *Espinoza* case, there was no need to determine whether the "young male co-employee" who injured her was acting within the scope of his employment. Consequently, *Espinoza* provides little guidance in deciding Mr. Worman's claim that Mr. Sanford was acting within the scope of his employment.

[¶ 16] We have precedent much more directly applicable in *respondeat superior* cases:

> Under the *respondeat superior* theory, an employer is liable for the negligence of an employee acting within the scope of his employment. *Hamilton* [*v. Natrona County Educ. Ass'n*], 901 P.2d [381,] 385 [ (Wyo.1995) ]; *Combined Ins. Co. of America v. Sinclair,* 584 P.2d 1034, 1042 (Wyo.1978). The conduct of an employee is within the scope of his employment "only if it is of the kind he is employed to perform; it occurs substantially within the authorized time and space limits; and it is actuated, at least in part, by a purpose to serve the master." *Hamilton,* 901 P.2d at 385 (citing *Miller v. Reiman–Wuerth Co.,* 598 P.2d 20, 22 (Wyo.1979)); *see also Restatement (Second) of Agency,* § 228 (1958).

*Austin v. Kaness,* 950 P.2d 561, 563 (Wyo. 1997). *See also Killian v. Caza Drilling, Inc.,* 2006 WY 42, ¶ 7, 131 P.3d 975, 978–79 (Wyo.2006); *Eklund v. PRI Environmental, Inc.,* 2001 WY 55, ¶ 12, 25 P.3d 511, 515 (Wyo.2001).

[¶ 17] As described by the district court, the arbitrator in Mr. Worman's case found that Mr. Sanford "was not performing the kind of work that he was hired to perform when he intentionally placed Mr. Worman in a headlock." To the contrary, his actions "interfered with the efficient and safe operation of the drilling rig." These findings underpinned the arbitrator's conclusion: "No reasonable inference could be made that

[Mr.] Sanford was acting within the scope of his agency when he engaged in the prohibited act of horseplay."

[¶ 18] Mr. Worman, however, relies on the point, as quoted above, that the employee's actions must be "actuated, at least in part, by a purpose to serve the master." He argues that we should not focus on Mr. Sanford's specific short-term behavior, but instead consider "whether the employee's general activities surrounding the tort were serving the principal's purposes." (Emphasis omitted.) Because Mr. Sanford was "on the clock" at the time of the incident, and at the well site serving as BP's company man and observing the ongoing drilling operations, Mr. Worman argues that Mr. Sanford was generally engaged in activities within the scope of his employment.

[¶ 19] The district court wrote that the "cases upon which [Mr.] Worman relies are helpful in addressing his contentions, but not for [Mr.] Worman." In *Sage Club v. Hunt*, 638 P.2d 161 (Wyo.1981), a bartender was held to be acting within the scope of his employment when he assaulted a bar patron. We noted that the bartender's duties "included collecting money for drinks, and he lost his temper over that matter. His duties also included keeping order in the bar and removing disruptive customers, which [he] apparently tried to do by pushing appellee down the stairs." *Id.* at 163. He also had "authority to act as a bouncer ... and his employment was of such a nature as to contemplate the use of force." *Id.* Based on these facts, we determined that the bartender's assault of a patron "was motivated, at least partially, by a desire to serve The Sage Club." *Id.*

[¶ 20] The district court applied the concepts from *Sage Club* to the facts of Mr. Worman's case, and concluded that the arbitrator was justified in finding that [Mr.] Sanford was not engaged in the scope of [his] employment. At the time of the headlock, he might well have been on the premises for work-related activities but he certainly was not employed to engage in horseplay and the horseplay was not actuated by any purpose to serve BP.

We also note the arbitrator's specific finding that Mr. "Sanford's testimony that he was just trying to promote camaraderie [is] not credible," and her finding "[b]y a preponderance of the evidence" that Mr. Sanford's actions were motivated solely by personal reasons. Unlike the bartender in *Sage Club*, Mr. Sanford was not, in any way, performing duties within the scope of his employment when he grabbed and choked Mr. Worman.

[¶ 21] The district court also analyzed *Condict v. Condict*, 664 P.2d 131, 134–35 (Wyo.1983), in which the employer was found liable when his employee rammed the ranch truck into another rancher's vehicle. The ranch employee's actions were taken, at least in part, to serve his employer's interest in being able to cross the bridge that was blocked by the other rancher's pickup. In contrast, as the district court stated, "no part of [Mr.] Sanford's engaging in horseplay was directed at any intention to serve BP. [He] was not, even in part, furthering BP's interests when he intentionally placed [Mr.] Worman in a headlock."

[¶ 22] Based on this analysis, the district court concluded that the arbitrator made no manifest mistake of law in determining that Mr. Worman was not entitled to an award. We agree, and affirm the district court's decision.